IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| (FNU), ABDULLA, | ) |
| | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )     Civil Action No. 05-1001 (ESH) |
| | ) |
| GEORGE W. BUSH, *et al.,* | ) |
| | ) |
| Respondents. | ) |
| | ) |

### DECLARATION OF DAVID N. COOPER

     Pursuant to 28 U.S.C. § 1746, I, Lieutenant Colonel David N. Cooper, Judge Advocate General's Corps, United States Air Force Reserve , hereby state that to the best of my knowledge, information, and belief, the following is true, accurate and correct:

     1.     I am the Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

     2.     I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner (FNU), Abdulla that are suitable for public release. The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or were redacted by an OARDEC staff member. This staff member also redacted information that would personally identify certain U.S. Government personnel in order to protect the personal privacy and security of those individuals.

     I declare under penalty of perjury that the foregoing is true and correct.

Dated:   16 August 2006                                                      

                                               David N. Cooper
                                             Lt Col, JAG Corps, USAFR



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: 1 0 9 0

2 4 MAR 2005

~~FOR OFFICIAL USE ONLY~~

From: Director, Combatant Status Review Tribunal

Subj: **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 556**

Ref:     (a) Deputy Secretary of Defense Order of 7 July 2004
         (b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #556 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John B. Wiegmann)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

~~FOR OFFICIAL USE ONLY~~

*#556*



### Department of Defense
### Director, Combatant Status Review Tribunals

18 Mar 05

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #34

Ref:    (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

<u>MEMBERS:</u>

███████████████, Colonel, U.S. Air Force; President

███████████████, Lieutenant Colonel, U.S. Air Force; Member (JAG)

███████████████, Lieutenant Colonel, U.S. Air Force; Member (JAG)

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy

*Encl. ①*

UNCLASSIFIED

22 Mar 05

MEMORANDUM

From:  Legal Advisor
To:    Director, Combatant Status Review Tribunal

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN # 556

Ref:   (a) Deputy Secretary of Defense Order of 7 July 2004
       (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl:  (1) Appointing Order for Tribunal #34 of 18 March 2005
       (2) Appointing Order for Tribunal #30 of 7 January 2005
       (3) Appointing Order for Tribunal #26 of 9 December 2004
       (4) Record of Third Tribunal Proceedings
       (5) Record of Second Tribunal Proceedings
       (6) Record of Original Tribunal Proceedings

1.  Legal sufficiency review has been completed on the subject Combatant Status Review
Tribunal in accordance with references (a) and (b).  After reviewing the record of the Tribunal, I
find that:

    a.  The detainee was properly notified of the tribunal process and elected to participate.
    *See* exhibit D-a.[1]

    b.  The three tribunals that considered the detainee's case were properly convened and
    constituted by enclosures (1), (2), and (3).

    c.  The tribunals substantially complied with provisions of references (a) and (b).  Note
    that some information in exhibit R-5 was redacted.  The FBI properly certified in exhibit
    R-2 that the redacted information would not support a determination that the detainee is
    not an enemy combatant.

    d.  The detainee requested two witnesses.  The original tribunal president determined that
    both witnesses were relevant and forwarded a request through the U.S. State Department
    to establish contact with the witnesses.[2]  According to the original tribunal decision
    report, the State Department did not receive a response from the Government of Pakistan
    and the tribunal president therefore declared the witnesses to be not reasonably available.
    Given the State Department's apparent inability to elicit a response from Pakistan, the

---

[1] Enclosure (6), the original record of proceedings, includes only those exhibits seen by the original tribunal,
exhibits R-1 through R-16 and exhibit D-a.  Enclosure (5) includes the additional exhibits that were added for the
consideration of the second tribunal and enclosure (4) includes the additional exhibits added for the third tribunal.
[2] References in paragraph 4 of enclosure (1) of the Original Tribunal Decision Report to the "CSRT Legal Advisor"
should more accurately read, "CSRT Assistant Legal Advisor."

UNCLASSIFIED

UNCLASSIFIED

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN #556

president had no alternative but to determine that the witnesses were not reasonably
available.

e.  On 15 December 2004, the original tribunal unanimously determined that the detainee
should no longer be designated as an enemy combatant.  Following that tribunal, CSRT
personnel conducted another search of the Government Information to ensure that all
relevant evidence had been provided to the tribunal.  They collected additional evidence
that eventually became exhibits R-17 through R-22 (attached to enclosure (5)).  Due to
the removal of one of the three members of the original tribunal panel, the additional
evidence, along with the original evidence and original Tribunal Decision Report, was
presented to tribunal panel #30 to reconsider the detainee's status.  On 21 January 2005
that tribunal also unanimously determined that the detainee should no longer be classified
as an enemy combatant.  Once again, additional information regarding the detainee was
sought, found, and presented to yet a third tribunal.  This additional additional
information became exhibits R-23 through R-30.  This time, the three members of the
second tribunal were no longer available, but the one original tribunal member who was
not available for the second tribunal was now available for the third.  That member, along
with two new members, comprised tribunal panel #34 and sat for the detainee's third
tribunal.  Following their consideration of the new additional information along with the
information considered by the first two tribunals, this Tribunal determined that the
detainee was properly classified as an enemy combatant.

f.  Tribunal panel #34's decision that detainee #556 is properly classified as an enemy
combatant was unanimous.

g.  The personal representative for the original and second tribunals was the same.  Due
to the departure of the original personal representative from OARDEC, another
individual acted as personal representative at the third tribunal.  Each personal
representative was given the opportunity to review their respective record of proceedings
and each declined to submit post-tribunal comments to the tribunal.

2.  The proceedings and decision of the tribunal meet the absolute minimum requirements for
legal sufficiency and no corrective action is required as a matter of law.

3.  Ultimately, we must determine whether this detainee has had a fair and meaningful
opportunity to contest his status as an enemy combatant before an independent tribunal; and
whether the Government possesses sufficient evidence to properly classify him as an enemy
combatant.  With regard to the first question, the detainee actively participated in the tribunal,
including making an extended statement.[3]  All three tribunals considered the detainee's
statement.  With regard to the second question, notwithstanding the convoluted path the case

---

[3] Although the detainee did not take the Muslim oath described in enclosure (8) to reference (b), he swore to tell the
truth.  The original tribunal accepted his statement as a sworn statement (notwithstanding the fact that the tribunal
labeled the statement, "Summarized Unsworn Detainee Statement").  *See* enclosure (3) of Original Tribunal
Decision Report.

2

UNCLASSIFIED

Subj:   LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
        FOR DETAINEE ISN #556

took, it is clear after reviewing all the evidence that more than sufficient evidence exists to
determine that the detainee is properly classified as an enemy combatant.  Neither reference (a)
nor (b), nor paragraph 1-6 of Army Regulation 190-8, requires a greater quantum of evidence
than has been presented in this case in order to establish that an individual detained during a
period of armed conflict is an unlawful enemy combatant.  I recommend that the decision of the
Tribunal be approved and the case be considered final.

JAMES R. CRISFIELD JR.
CDR, JAGC, USN

3
UNCLASSIFIED



### Department of Defense
### Director, Combatant Status Review Tribunals

7 Jan 05

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #30

Ref:    (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

> MEMBERS:
>
> ███████████████, Colonel, U.S. Marine Corps Reserve; President
>
> ███████████████, Commander, U.S. Navy; Member (JAG)
>
> ███████████████, Major, U.S. Air Force; Member

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy

Encl. (2)



# Department of Defense
### Director, Combatant Status Review Tribunals

9 Dec 04

From:   Director, Combatant Status Review Tribunals

Subj:   APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #26

Ref:    (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

         **MEMBERS:**

         ███████████████████, Colonel, U.S. Air Force; President

         ███████████████████, Commander, U.S. Navy; Member (JAG)

         ███████████████████, Major, U.S. Air Force; Member

                              J. M. McGARRAH
                              Rear Admiral
                              Civil Engineer Corps
                              United States Navy

Encl. (3)

~~SECRET//NOFORN//X1~~

### (U) Combatant Status Review Tribunal Decision Report Cover Sheet

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).


(U) TRIBUNAL PANEL: ___#26___

(U) ISN#: ___556___

Ref:   (a) (U) Convening Order for Tribunal #26 of 9 December 2004 (U)
       (b) (U) CSRT Implementation Directive of 29 July 2004 (U)
       (c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl:  (1) (U) Unclassified Summary of Basis for Tribunal Decision (U/~~FOUO~~)
      (2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
      (3) (U) Summary of Detainee/Witness Testimony (U/~~FOUO~~)
      (4) (U) Copies of Documentary Evidence Presented (S/NF)
      (5) (U) Personal Representative's Record Review (U/~~FOUO~~)

1. (U) This Tribunal was convened by references (a) and (b) to make a determination as to whether the detainee meets the criteria to be designated as an enemy combatant as defined in reference (c).

2. (U) On 15 December 2004, the Tribunal determined, by a preponderance of the evidence, that Detainee #556 shall no longer be classified as an enemy combatant as defined in reference (c).

3. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).

████████████████████████████, Colonel, USAF
Tribunal President

UNCLASSIFIED//~~FOUO~~

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

### (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____#26_____
ISN #: _____556_____

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this detainee shall no longer be classified as an enemy combatant as defined in the DEPSECDEF Memo of 7 July 2004. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The Tribunal hearing was conducted on 15 December 2004. The Recorder presented Exhibits R-1 through R-3 during the unclassified portion of the Tribunal. The primary exhibit, the Unclassified Summary of Evidence (Exhibit R-1), indicates that the detainee is associated with the Taliban and al Qaida; when arrested by Pakistani authorities, the detainee had a falsified Turkish passport that he had purchased from a Turk; the detainee attended a "physical fitness" camp in Jalalabad, Afghanistan for six months; the detainee was at the Khana Gulam Bacha guesthouse on the Taliban front lines in Kabul Afghanistan in late 1999 and early 2000; the detainee stated he had a Jamiat Al Islamiya identification card; Jamiat Al Islamiya is designated as a non-governmental organization that supports terrorist activities; and the detainee was arrested in Islamabad, Pakistan by Pakistani authorities while living in a house used by Arabs, and was later turned over to U.S. custody. The Recorder called no witnesses.

The detainee participated actively in the Tribunal process. After the detainee was sworn, he provided an extensive explanation for each of the allegations on the Unclassified Summary of Evidence. Afterwards, he answered questions posed by the Tribunal members. The detainee's testimony, including his responses to the questions posed to him, is summarized in Enclosure (3) to the CSRT Decision Report. The detainee requested two witnesses, however the Tribunal President ruled that the witnesses were not reasonably available. See paragraph 4, below. The detainee submitted no evidence.

During the classified session of the Tribunal, the Recorder presented Exhibits R-4 through R-16, identifying those exhibits that directly addressed the allegations in the Unclassified Summary of Evidence and those that provided amplifying information. The Personal Representative introduced no classified documents, but did comment on aspects of the classified evidence that, in his view, tended to be exculpatory.

UNCLASSIFIED//~~FOUO~~

### 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

    a. Exhibits: D-a and R-1 through R-16.

    b. Testimony of the following persons: None.

    c. Sworn statement of the detainee: See Enclosure (3) to the CSRT Decision Report.

### 4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses

The Detainee requested the following witnesses be produced for the hearing:

| Witness | President's Decision | Testified? |
|---|---|---|
| Abdul Aziz Nooristani | Not reasonably available | no* |
| Husseinjon | Not reasonably available | no* |

* The Tribunal President explained to the detainee, on the record, that he ruled that these witnesses' testimony could be relevant, and asked that the U.S. Government attempt to produce them. The CSRT legal advisor then used standard CSRT procedures to request the U.S. Department of State attempt to contact these individuals through the Pakistan Government. The Department of State subsequently informed the CSRT legal advisor that on or about 26 November 2004, the Pakistani Government was requested to locate these individuals. After a reasonable amount of time, the Pakistani Government did not respond to the request. Therefore, lacking the cooperation of the Pakistani Government, the Tribunal President found both of these witnesses not reasonably available.

The detainee requested no additional evidence be produced; no rulings were necessary.

### 5. Discussion of Unclassified Evidence

The Tribunal considered the following unclassified evidence in making its determinations:

    a. The recorder offered Exhibits R-1 through R-3 into evidence during the unclassified portion of the proceeding. Exhibit R-1, the Unclassified Summary of Evidence, while helpful in that it provides a broad outline of what the Tribunal can expect to see, is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2 contained no useful information. Exhibit R-3, the U.S. Department of Homeland Security's Terrorist Organization Reference Guide, identified a number of organizations as terrorist organizations, but did not directly relate to the detainee or any other information provided during the unclassified session. Accordingly, the Tribunal had to look to classified exhibits for support for the Unclassified Summary of Evidence.

    b. Essentially the only unclassified evidence the Tribunal had to consider was the detainee's sworn testimony. A summarized transcript of the detainee's sworn testimony is

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

attached as CSRT Decision Report Enclosure (3). In sum, the detainee acknowledged that he had purchased a forged passport and identification card, but asserted that he did so with the intention of migrating to Turkey, where he believed he'd find better economic prospects. He did dispute the name of the organization on the forged I.D. card, stating that it was not the same name as that indicated in the Unclassified Summary of Evidence. He also noted that the timeframe in which he went to a gym in Peshawar, Pakistan, was some five years ago. The detainee denied any involvement with al Qaida or the Taliban.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report

## 6. Consultations with the CSRT Legal Advisor

The Tribunal President consulted with the CSRT Assistant Legal Advisor concerning the witness requests discussed above.

## 7. Conclusions of the Tribunal

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

     a. The detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was deemed necessary.

     b. The detainee understood the Tribunal proceedings. He asked no questions regarding his rights and actively participated in the hearing.

     c. That this detainee shall no longer be classified as an enemy combatant as defined in the DEPSECDEF Memo of 7 July 2004.

## 8. Dissenting Tribunal Member's Report

None. The Tribunal reached a unanimous decision.

Respectfully submitted,



Colonel, USAF

Tribunal President

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED

1 Feb 05

MEMORANDUM

From:  Assistant Legal Advisor
To:    Director, Combatant Status Review Tribunal
Via:   Legal Advisor

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN # 556

Ref:   (a) Deputy Secretary of Defense Order of 7 July 2004
       (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl:  (1) Appointing Order for Tribunal # 26 of 9 December 2004
       (2) Appointing Order for Tribunal # 30 of 7 January 2005
       (3) Record of Tribunal Proceedings

1.  Legal sufficiency review has been completed on the subject Combatant Status Review Tribunal in accordance with references (a) and (b).  After reviewing the record of the Tribunal,[1] I find that:

   a.  The detainee was properly notified of and actively participated in the Tribunal process.  The detainee provided a sworn oral statement to Tribunal # 26.

   b.  On 15 December 2004, Tribunal # 26 determined by a unanimous decision that the detainee should no longer be classified as an enemy combatant.  Subsequently, the Recorder obtained additional information not previously available.  This information is contained in exhibits R-17 through R-22.

   Tribunal #30 was assigned to re-hear the case based on this new information.  Prior to considering the new evidence, Tribunal # 30 reviewed and examined the proceedings of Tribunal #26.  Tribunal # 30 accepted the conclusions of Tribunal # 26 as correct.

   c.  Tribunal # 26 and Tribunal # 30 were properly convened and constituted by enclosures (1) and (2).

   d.  The Tribunals substantially complied with all provisions of references (a) and (b).  Note that some information in exhibit R-5 was redacted.  The FBI properly certified in exhibit R-2 that the redacted information would not support a determination that the detainee is not an enemy combatant.

---

[1] The decision and proceedings of Tribunal # 26 are also legally sufficient.  However, since Tribunal # 30 reviewed the proceedings of Tribunal # 26 and had available additional information, its decision is the relevant one for purposes of legal review.

UNCLASSIFIED

UNCLASSIFIED

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN # 556

    e.  The detainee requested two witnesses, his local Imam and a friend from a refugee camp. The Record of Proceedings contains no proffer of expected testimony.  However, the president of Tribunal # 26 determined that these witnesses were relevant.  The Department of State contacted the Pakistan Government, but received no response. Under the circumstances, the Tribunal President determined that these witnesses were not reasonably available.  In my opinion, this was not an abuse of discretion and no corrective action is required.

The detainee did not request that any other witnesses or evidence be produced.

    f.  Both Tribunal # 26 and Tribunal # 30 determined that detainee # 556 should no longer be classified as an enemy combatant.  Both decisions were unanimous.

    g.  The detainee's Personal Representative was given the opportunity to review the record of proceedings and declined to submit post-tribunal comments to the Tribunal.

2.  The proceedings and decision of Tribunal #30 as reflected in enclosure (3) are legally sufficient and no corrective action is required.  While in my opinion sufficient evidence exists to classify the detainee as an enemy combatant, reasonable Tribunal members could determine that the detainee should not be classified as an enemy combatant based on the evidence.  I can find no reason to disturb this determination.

3.  I recommend that the decision of Tribunal # 30 be approved and the record of proceedings be forwarded to the Secretary of the Navy in accordance with reference (b).

BREE A. ERMENTROUT
CDR, JAGC, USNR

UNCLASSIFIED

2

UNCLASSIFIED//~~FOUO~~

## Summarized Unsworn Detainee Statement

*The Tribunal President read the Hearing Instructions to the Detainee; the Tribunal President then addressed the Detainee to answer questions and confirm he understood the process.*

Tribunal President: Do you understand this process?

Detainee: I understand everything; it would be good for me if you would do it in a question and answer session type setting, and let me defend myself.

Tribunal President: We understand; later in this Tribunal we will have that opportunity. Do you have any questions concerning the Tribunal process?

Detainee: My only concern is when you are talking about the classified documents, because I don't understand what you could possibly have against me.

Tribunal President: It might be helpful if I give you a definition of a classified document.

Detainee: I understand the definition, but I'm just wondering if and how you're going to use those materials to place charges against me.

Tribunal President: The Unclassified Summary of Evidence you've been read is based on a number of things. Some of that information may be classified; and as you know, the classified definition means information we cannot release to you, because it may damage our country. If you remember the promise we took of what we would do here today; we have not seen any of your information. We promise to review everything that is given to us, and consider your classification as an enemy combatant. Recognize that this is not a criminal or court proceeding; this is an administrative review to determine if the government has properly classified you as an enemy combatant. The members here are not intelligence officers or security officers [the translator was having difficulty explaining this point, so the Tribunal President re-worded this statement]; we are not combat, fighters or intelligence officers, so we are independent in reviewing all this information to determine if the classification was done properly. I know you may be a little concerned about the classified information and what it contains. Your Personal Representative has access to the classified information.

Detainee: But he (Personal Representative) didn't see it yet?

Tribunal President: The Personal Representative has seen the classified information; later, in a closed session, we may be provided classified information. The Personal Representative's responsibility is to identify to the Tribunal any information in that classified information that would show that you have not been classified properly. I hope that explains the procedures, and why we are going through this process. I would like to proceed with more information, and at any time, if you have any other questions about what we're doing and why, you may ask.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

*The Tribunal President then requested the Detainee Election Form (Exhibit D-A). The Detainee inquired about the nature and contents of the form; the Personal Representative and the Tribunal President explained that the form indicated that the Detainee had requested to participate in the proceedings, and wished to make a statement. The Tribunal President confirmed the Detainee understood the nature and contents of the form.*

*The Recorder submitted Exhibits R-1 (Unclassified Summary of Evidence), and Exhibits R-2 through R-3 to the Tribunal. Copies had previously been provided to the Personal Representative.*

*The Recorder read in full the Unclassified Summary of Evidence to the Tribunal. The Tribunal President addressed the Detainee to explain that this evidence was identical to information he was provided previously by his Personal Representative, and that he understood why it was being presented at this time.*

*The Tribunal President then addressed the Detainee Election Form (Exhibit D-A), to explain in further detail its contents to the Detainee. The Tribunal President also confirmed the identity of the two Witnesses requested by the Detainee.*

Tribunal President: As the Personal Representative has informed you, I determined these Witnesses would provide relevant testimony to this Tribunal. I directed the United States government contact these individuals through the Pakistan government. The Pakistan government was contacted on or about the 26th of November. As of today, the government of Pakistan has not responded to our request. This has been a reasonable amount of time for the government to respond. Without the cooperation of that government, the United States government is unable to contact the Witnesses to obtain testimony. I make the ruling, at this time, that I am forced to find these Witnesses are not reasonably available. That addresses your request for Witnesses, and I am sorry that we are not able to provide your Witnesses today.

*The Tribunal President confirmed the Detainee still wished to make a statement, and could do so with the assistance of his Personal Representative; the Tribunal President then asked if the Detainee wished to be administered the Muslim oath.*

Detainee: I am actually ready to give my statements either way.

Tribunal President: The oath is your choice; it is a promise to tell the truth. We do not require an oath; it is your choice.

Detainee: I'm going to tell the truth whether under oath, or not under oath. Still, it's up to you.

Tribunal President: It is your choice. From what I understand, you said you would tell the truth, and that is fine with us.

Detainee: I'm actually promising I'll be telling only the truth.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

Tribunal President: That is fine with us; you may proceed. You are free to tell us anything about this information at all; we are not interrogators, so this is your first opportunity, maybe, to present information to the United States government.

*The President determined that the Detainee had made a personal oath and considered his testimony would be considered sworn. With the assistance of the Personal Representative, the Detainee addressed the allegations.*

*3-1. When arrested by Pakistani authorities, the Detainee had a falsified Turkish passport that he had purchased from a Turk.*

Detainee: First of all, the reason why I ended up having this passport, was because, as you know, there was a war in Afghanistan for the past 28 years. Afghani people didn't have many occupations, and even in Pakistan, could not find a decent job there. As you know, there's been war for so many years, and the people were never able to do something; they only knew how to fight. Even if they wanted a decent job, or join the government, it was impossible. That's the reason a lot of Afghanis had to leave the country for Pakistan. In order to provide food for the family, as the head of the family, I had to find something to do. Of course, a decent person cannot commit crimes or steal, so everyone wants a decent job. There are too many refugees coming from Afghanistan, so Pakistan never supported them, and gave them a hard time; they were actually pushing people to bribe them. It's very hard to find a job over there, so if you find a decent job, at least for one day, you can get 80 rupees. Eighty rupees is not much money, just to support yourself, you still have to have a place to live, so it's pretty much nothing even for just one person. Eighty rupees, is about one and a half dollars, so it's nothing. It's not possible to support the whole family with that type of money. Since this money is not enough, we were living in something like a cave, or shelter, not even a house; we are very poor since we're not making enough money. You wonder how a human being can live this kind of lifestyle; it's very emotional [-ly difficult]. That's the reason most people look for something different, so they sometimes go and borrow money from somebody. That's the reason the people try to go somewhere, like Russia or Turkey, to make a better living and provide for their families. After the first time I was captured, I told them my story and they released me. After that, I went to Mousad, and he said he would help me out. He actually promised, after I told my story, to help me go to whatever foreign country I wanted to, and would provide everything I needed for that matter. He personally didn't know what I needed, so he brought somebody else to his house and found out how much money I needed to go to a foreign country. I heard there are people [who are] somehow able to go to foreign countries, and I needed to know what it took to coordinate all that. While I was in Afghanistan, I had never used or even held a passport. Mousad's friend told me he could make me a passport; he asked me which country I wanted to go. When I was a little boy, I went to Turkey, so I told him that's where I wanted to go. Back then, my father was living in Turkey and had several friends there. I stayed there for about two and a half years, and came back; the conditions weren't that good in Turkey. When I was in Turkey, my father wanted me to get an education, but it didn't happen that way, and I had to go back to Afghanistan; it didn't happen the way my father wanted. In Turkey, I was living at my father's friend's house. [My father's friend's name was Hiatollat, and his friend was Mohoud also. I stayed in their house for two and a half to three years. When Mousad's friend told me it would be hard to find a job if you don't know anyone; I told him that my father's friend Hiatollat and Mohoud were there, and

UNCLASSIFIED//FOUO

could help me to find a job. Since to go there you have to spend lots of money, you have to borrow money just to start some kind of job. If you're not able to get your business going, you have to come back even more in debt. I talked to him on the phone, and asked if he would be able to help me out; he said we'd be able to help you, so just come over. I got confirmation from my father's friend [that] he'd help me out, so I told Mousad's friend to prepare the papers to help me go there. The Uzbek and Turkish language are close to each other, so you can understand each other; if you have a passport you can go there, and you can understand [the language].

Tribunal President: I think we fully understand how you obtained the passport now; is there anything else you'd like to tell us on that point?

Detainee: I just want to add that while I was in the process of getting the passport, I was in their house, and the Pakistani authorities came there to arrest Masoud's friend at that moment. Since I was there, they just took me along with him.

Tribunal President: I understand.

Detainee: At that moment, I had that ID card of Jamiat Al Islamiya. It's not the name of the madrassas like it says here on the allegation; it's like an Islamic university ID card.

Tribunal President: OK.

Personal Representative: (addressing the Detainee) Do you want me to go to allegation # 4, about the Jamiat Al Islamiya identification card?

Detainee: No; I just want to let you know it's not just the first point I'm talking about. I just want to let you know they were [also] making a false ID for me for that university.

*The Personal Representative then read allegation # 2, but was interrupted by the Detainee.*

Detainee: Does that mean we're done with the first point?

Personal Representative: Unless there's something else you'd like to add?

Detainee: Again, I just wanted to let you know that at that point [when I was arrested], I had that ID card.

Tribunal President: Are you ready to move to the next point?

Detainee: Was I able to convince you with the first point? Is that enough?

Tribunal President: We may have some questions later, and we'd like to get through all your testimony first, so we can organize our questions. That's why we're taking notes, so please proceed with the second point.

UNCLASSIFIED//FOUO

UNCLASSIFIED//~~FOUO~~

*3-2.  The Detainee attended a "physical fitness" camp in Jalalabad, Afghanistan for six months.*

Detainee:  One interrogator asked me about being pretty physically fit, and they asked me if I ever did any sports activities.  At that time, I told them that in Peshawar, Pakistan, they had a gym, and I went there for five or six months to keep myself in shape.  My understanding is that this is just a mistranslation, and I don't know how they got Jalalabad from this.  I didn't go to Jalalabad for this specific reason.  The truth of this is that I was in Peshawar attending a gym for five or six months.

Personal Representative:  And I have in my notes that this was about five years ago?

Detainee:  Yes, that's about right, because I've been here about three years, and it was about two years before that.

*3-3.  The Detainee was at the Khana Gulam Bacha guesthouse on the Taliban front lines in Kabul, Afghanistan in late 1999 and early 2000.*

Detainee:  Like I have told you before, I have never heard of this place, I don't know of this place, and I was never associated with the Taliban.  Like I told you before, this was never mentioned in any of my interrogations, so I don't know where this is coming from.  I never stayed even one month in any kind of guesthouse; not even for a month when I was living in Kabul.  Any person with responsibility for a family wouldn't just stay in a guesthouse for a month.  From Peshawar, we were going through Jalalabad to Kabul; that was our route.  At that time, when we got to Kabul, if you can find a car, you can continue by road to Maazar-e-Sharif, but we didn't, so we had to stay overnight somewhere.  Even if you have transportation, no one travels at night because it's dangerous; everyone travels during the daytime.  For that reason, people will just find some kind of guesthouse or someplace to eat and stop for the night.  After spending the night, after morning prayers and breakfast, you try to continue traveling to Maazar-e-Sharif.  You also don't just stay in any place, because it is dangerous; there's all kinds of people around when you're sleeping, and they might steal whatever belongings you have.  You don't usually think about who this place might belong to, Taliban or anyone else, you just stay there overnight, take a rest, and continue your travels in the morning.  There's so many nationalities in Afghanistan, so you just try to find a nice, decent place to stay overnight.  If you stay at someplace, you don't know if it belongs to the Taliban or other different kinds of people.  Again, that place I went I didn't know who it belonged to; it was close to the road, and we had to stay there overnight, and continue in the morning.

Tribunal President:  I think that's very complete; thank you.

Detainee:  Yes; that's it.

*3-4.  The Detainee stated he had a Jamiat Al Islamiya identification card.*

Detainee:  Before I had a passport, I had never had that ID or that kind of document.  The person who made the ID said it would be hard to go around without any other documentation, and that the police would give me a hard time, stop me on the street, take everything you have, and won't

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

let you go. He told me that there was an Islamic university in Turkey with lots of students; if you have that ID and show it to the police, they will let you go and not give you a hard time. That was the reason I agreed to have that ID, so it would be easier for me to get around Turkey. If you want to find out if I'm speaking the truth, you can actually request this from that Islamic university, and you would find out my ID was false, and I never went there. If you show them a picture, they will tell you I am not a student over there; that's pretty much it.

*3-5. Jamiat Al Islamiya is designated as a non-governmental organization that supports terrorist activities.*

Detainee: The reason you put this item is just because you found the ID of that university, but since I never studied over there, I guess that proves this is not related to me.

Personal Representative: What was the name of the university?

Detainee: You can call it Islamiya Jamiat, but it's kind of connected to a big, huge [inaudible] in Islamabad, and it's the one I saw.

*3-6. The Detainee was arrested in Islamabad, Pakistan by Pakistani authorities while living in a house used by Arabs, and was later turned over to U.S. custody.*

Detainee: I just want to ask you how was I related to the owner of that house? The madrassas where I was studying had a huge library, and I used to go there. That library was open for the public, and everyone wanting to seek knowledge and read books; it had places to sit. At that time, I actually met Mousad, and you know when you are in a foreign place, you want to talk to somebody who speaks your language, and that's how we started to know each other. That person introduced himself to me as Turkish, because he lived a long time in Turkey. We used to talk a lot, and we connected, and we started a friendship. I told him that I am an Uzbek from Afghanistan, and we had conversation with a little Turkish and a little bit Uzbek. He told me how he came to Pakistan, and that he had a family here, and had relatives here. He went there because he had an injury on his leg. He told me he used to live in Afghanistan, and had a problem with his leg, and while he was in Turkey, he heard the only cure was in Pakistan, and the place they had the cure was in Peshawar. That's how we became friends; he told me his story and I told mine. He was always calling for me at the madrassas so we could talk. One time he actually invited me to his house; I went and was a guest at his house. We ate together and had a very good time. I had been to his house several times for conversation and food, and never saw anything suspicious; he had his family and a nurse and his own kids. He seemed like a very normal person. At some point he had to move from Islamabad; when he moved, I never visited him. One time he called from his house to the madrassas asking for me, and at that time, he gave me his telephone number. Previously in Peshawar I had been captured, but released after that. The Pakistani government actually captured me. At one point, I was at a friend's house, he was a Turk man in Pakistan; when I was in his house, they came to get him. There were three people in the house; me, a person named Imatubbha (ph), and a third person; I forgot his name. It was midnight when they came and captured us. When they captured us they put us in jail, and asked lots of questions and interrogated us. We gave them all the information they needed. The second person, I just remembered, was named Abdul Bakhid (ph). When they asked questions,

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

they were trying to find out if I was telling the truth; they went around comparing stories to see if I was lying. After they got all the information I knew, they compared it, and I'd been in jail 28 days; one of your representatives was there, and I spoke to him. He got some information from me, too. After they found out and were convinced I was telling the truth, they released me after that 28 days in jail. After that, I contacted Mousad, and told him what happened. He told me to come over, see the place he lives, and we would talk about these issues. I called him and told him I was coming, and I confirmed his address and everything. I took a bus to Islamabad, and he picked me up at the bus stop and took me to his home. At his house, I told him everything, and now we are coming back to the first item, about the passport. His friend explained to me what it takes and how much money for his service to get the passport. When he got all that, he went back to Peshawar to prepare all that. It was around the 10th day after Ramadan, and I went home to talk to my father about this and my family and friends [too]. After I got everything and all the money I needed for the passport, I went back to Islamabad to Mousad's house. Before I went to Islamabad to discuss this issue, I actually had to call to Turkey and ask to make sure my father's friend was able to help me first. After getting permission from my parents and confirming my father's friend would help me in Turkey, I went back to Islamabad. After everything was ready I went to Islamabad. I went to Mousad's house, and talked to his friend and gave him all the money he requested; he said it would take some time, so I stayed there about three days. At that point, when everything was ready on the third day, there were still papers I needed to leave Pakistan, a visa, to get permission to leave. I still didn't have that paper yet. We had almost everything ready, and it was at that time that the Pakistani government came in. Of course, when traveling, you have to have extra clothes, and when they came, I had suitcases with everything I needed, and they saw that. They took all of us to jail, and whatever I told you now, I told them, too. Mousad pretty much told them everything I told them. Before I was captured, I always thought the other guy was Turkish, so I told them this; they told me no, he's not Turkish, he's Arab. While I was in Mousad's house, I only knew the person doing my passport, and his name was Abdul Latif; I didn't see anybody else while I was living in his house. I just knew Mousad as a normal person, and I saw nothing suspicious except Latif visiting the house; he just lived with his family and was doing normal things. Obviously, I didn't even possibly think he was Arab; I though he was nothing else but Turkish. After the first time I was captured, I was interrogated; they compared all I said and then released me when they learned it was all true. They asked me a lot of questions, and they asked if I knew of conflicts in the mountains with Arabs; that was the first I heard of this. Thank God I was held in jail at that time; otherwise, I might have even more evidence here, too. I am an innocent person that's been held here 3 years in these conditions; I don't think any one of you could make it even a month here. I've been here three years, and I have lots of problems I've never had before, that happened here; I wonder if any one of you could make it even one or two days in my condition here. I believe that none of you could be away from your family that long, and there won't be a home to come back to.

Tribunal President: I'd like to get back to the hearing, and ask some questions if you're done with your statement.

Detainee: OK.

UNCLASSIFIED//~~FOUO~~

## Tribunal Member Questions to Detainee

Q: You said that the name on the ID card was not yours; what was the name on the ID card?
A: Whatever the name I had on the passport, was the same as the name on the ID card; right now, I don't honestly remember that.

Q: Does the name Jamiat al-Ta'awun al-Islamiyya sound familiar?
A: The name was Islamiya Jamiat university.

Q: Have you ever heard of this other group?
A: I never heard of it.

Q: What was Mousad's full name?
A: I knew it was Mousad; I never heard any other name.

Q: He never told you any name other than Mousad?
A: I knew he had a little son, named Abu Hamsa (ph). He also had a daughter, but at this moment, I don't remember her name.

Q: Earlier you said you'd traveled from Peshawar through Jalalabad, through Kabul towards Maazar-E-Sharif; I understand that must be a long journey, and you would have to stay at a guesthouse. I would like to know why you were traveling to Maazar-E-Sharif; was that where your family's from, friends, or a part of work? I would like to know more.
A: My previous place to live was Baglon; it was actually close to Maazar-E-Sharif. There is another place named Samangon (ph), and you must go through that province. After that, there is Maazar-E-Sharif; after that, there is Shebergen, and after that there is the place my family was.

Q: So you used to live there?
A: Actually the place I used to live was Totukolat (ph). I used to live there and travel there, and that was the place I grew up.

Q: When was the last time you were there?
A: After I had been released after my first capture, I actually went there to discuss that issue with my parents and friends over there. I went back to my parent's house, and I got their approval, and collected about $300 from them; I then went back to Peshawar to see Abdul Bakhid for $700. After I had $1000, so I went back to Islamabad.

*The Tribunal President confirmed no other Tribunal Members had additional questions or information to present. The Tribunal President thanked the Detainee for his testimony and participation.*

*The Tribunal President explained the remainder of the Tribunal process, and adjourned the open session.*

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

## **AUTHENTICATION**

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.

, Colonel, USAF
Tribunal President

# DETAINEE ELECTION FORM

Date: 18 Nov 04

Start Time: 1300

End Time: 1545

ISN#: 556

Personal Representative: ████████████, LT COL

Translator Required? YES          Language? UZBEK

CSRT Procedure Read to Detainee or Written Copy Read by Detainee? YES

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Detainee Election:**

[X]     **Wants to Participate in Tribunal**

[ ]     **Affirmatively Declines to Participate in Tribunal**

[ ]     **Uncooperative or Unresponsive**

**Personal Representative Comments:**

- Will speak to each piece of evidence.
- Requests PR read each piece of evidence one at a time so detainee can respond to each.
- Detainee requested 2 out-of-camp witnesses.
  -- First witness is detainee's Imam at the local mosque.
  -- Second witness is detainee's friend from a refugee camp.
- Detainee did not request any documentary evidence.

Personal Representative: _____

Exhibit D-a

UNCLASSIFIED

## Combatant Status Review Board

TO: Personal Representative

FROM: OIC, CSRT (5 November 2004)

Subject: Summary of Evidence for Combatant Status Review Tribunal – KHAN, Abdullah Mohammad

1. Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that the detainee is associated with the Taliban and al Qaida.

The detainee is associated with the Taliban and al Qaida:

   1. When arrested by Pakistani authorities, the detainee had a falsified Turkish passport that he had purchased from a Turk.

   2. The detainee attended a "physical fitness" camp in Jalalabad, Afghanistan for six months.

   3. The detainee was at the Khana Gulam Bacha guesthouse on the Taliban front lines in Kabul Afghanistan in late 1999 and early 2000.

   4. The detainee stated he had a Jamiat Al Islamiya identification card.

   5. Jamiat Al Islamiya is designated as a non-governmental organization that supports terrorist activities.

   6. The detainee was arrested in Islamabad, Pakistan by Pakistani authorities while living in a house used by Arabs, and was later turned over to U.S. custody.

4. The detainee has the opportunity to contest his designation as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

UNCLASSIFIED

Exhibit R-1

## Memorandum



| | | | |
|---|---|---|---|
| To | : | Department of Defense<br>Office of Administrative Review<br>for Detained Enemy Combatants<br>Capt. Charles Jamison, OIC, CSRT | Date 11/05/2004 |

From  :    FBI GTMO
Counterterrorism Division
Asst. Gen. Counsel ██████████

Subject    REQUEST FOR REDACTION OF
NATIONAL SECURITY INFORMATION
████████████████████

  Pursuant to the Secretary of the Navy Order of 29 July 2004, Implementation of Combatant Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba, Section D, paragraph 2, the FBI requests redaction of the information herein marked[1]. The FBI makes this request on the basis that said information relates to the national security of the United States[2]. Inappropriate dissemination of said information could damage the national security of the United States and compromise ongoing FBI investigations.

CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A
DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

  The FBI certifies the aforementioned redaction contains no information that would support a determination that the detainee is not an enemy combatant.

  The following documents relative to ISN 556 have been redacted by the FBI and provided to the OARDEC:

FD-302 dated 06/17/02

----

  [1]Redactions are blackened out on the OARDEC provided FBI document.

  [2]See Executive Order 12958

Exhibit ___

UNCLASSIFIED

Memorandum from ▆▆▆▆▆▆▆ to Capt. Charles Jamison
Re:   REQUEST FOR REDACTION, 11/05/2004


        If you need additional assistance, please contact Asst.
Gen. Counsel ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, or Intelligence Analyst (IA)
▆▆▆▆ IA ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

UNCLASSIFIED



**U.S. Department of Homeland Security**
**U.S. Customs and Border Protection**
**Office of Border Patrol**

# Terrorist Organization
# Reference Guide

January 2004

Exhibit R-3

## Terrorist Exclusion List[3]

Section 411 of the USA PATRIOT ACT of 2001 (8 U.S.C. § 1182) authorized the Secretary of State, in consultation with or upon the request of the Attorney General, to designate terrorist organizations for immigration purposes. This authority is known as the "Terrorist Exclusion List (TEL)" authority. A TEL designation bolsters homeland security efforts by facilitating the USG's ability to exclude aliens associated with entities on the TEL from entering the United States.

## Designation Criteria

An organization can be placed on the TEL if the Secretary of State finds that the organization:

- commits or incites to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;
- prepares or plans a terrorist activity;
- gathers information on potential targets for terrorist activity; or
- provides material support to further terrorist activity.

Under the statute, "terrorist activity" means any activity that is unlawful under U.S. law or the laws of the place where it was committed and involves: hijacking or sabotage of an aircraft, vessel, vehicle or other conveyance; hostage taking; a violent attack on an internationally protected person; assassination; or the use of any biological agent, chemical agent, nuclear weapon or device, or explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property. The definition also captures any threat, attempt, or conspiracy to do any of these activities.

## Designation Process

The Secretary of State is authorized to designate groups as TEL organizations in consultation with, or upon the request of the Attorney General. Once an organization of concern is identified, or a request is received from the Attorney General to designate a particular organization, the State Department works closely with the Department of Justice and the intelligence community to prepare a detailed "administrative record," which is a compilation of information, typically including both classified and open sources information, demonstrating that the statutory criteria for designation have been satisfied. Once completed, the administrative record is sent to the Secretary of State who decides whether to designate the organization. Notices of designations are published in the Federal Register.

## Effects of Designation

### Legal Ramifications

Individual aliens providing support to or associated with TEL-designated organizations may be found "inadmissible" to the U.S., i.e., such aliens may be prevented from entering the U.S. or, if already in U.S. territory, may in certain circumstances be deported. Examples of activity that may render an alien inadmissible as a result of an organization's TEL designation include:

- membership in a TEL-designated organization;
- use of the alien's position of prominence within any country to persuade others to support an organization on the TEL list;
- solicitation of funds or other things of value for an organization on the TEL list;
- solicitation of any individual for membership in an organization on the TEL list; and
- commission of an act that the alien knows, or reasonably should have known, affords material support, including a safe house, transportation,
- communications, funds, transfer of funds or other material for financial benefit, false documentation or identification, weapons (including chemical,
- biological, or radiological weapons), explosives, or training to an organization on the TEL list.

(It should be noted that individual aliens may also found inadmissible on the basis of other types of terrorist activity unrelated to TEL-designated organizations; see 8 U.S.C. §1182(a)(3)(B).)

## Other Effects

1. Deters donation or contributions to named organizations.
2. Heightens public awareness and knowledge of terrorist organizations.
3. Alerts other governments to U.S. concerns about organizations engaged in terrorist activities.
4. Stigmatizes and isolates designated terrorist organizations.

## Background

On December 5th, 2001 Secretary of State Colin Powell, in consultation with the Attorney General designated the following organizations, thereby placing them on the Terrorist Exclusion List:

## Terrorist Exclusion List Designees

- Al-Ittihad al-Islami (AIAI)
- Al-Wafa al-Igatha al-Islamia

(UNCLASSIFIED)

- Asbat al-Ansar
- Darkazanli Company
- Salafist Group for Call and Combat (GSPC)
- Islamic Army of Aden
- Libyan Islamic Fighting Group
- Makhtab al-Khidmat
- Al-Hamati Sweets Bakeries
- Al-Nur Honey Center
- Al-Rashid Trust
- Al-Shifa Honey Press for Industry and Commerce
- Jaysh-e-Mohammed
- Jamiat al-Ta'awun al-Islamiyya
- Alex Boncayao Brigade (ABB)
- Army for the Liberation of Rwanda (ALIR) -- AKA: Interahamwe, Former Armed Forces (EX-FAR)
- First of October Antifascist Resistance Group (GRAPO) -- AKA: Grupo de Resistencia Anti-Fascista Premero De Octubre
- Lashkar-e-Tayyiba (LT) -- AKA: Army of the Righteous
- Continuity Irish Republican Army (CIRA) -- AKA: Continuity Army Council
- Orange Volunteers (OV)
- Red Hand Defenders (RHD)
- New People's Army (NPA)
- People Against Gangsterism and Drugs (PAGAD)
- Revolutionary United Front (RUF)
- Al-Ma'unah
- Jayshullah
- Black Star
- Anarchist Faction for Overthrow
- Red Brigades-Combatant Communist Party (BR-PCC)
- Revolutionary Proletarian Nucleus
- Turkish Hizballah
- Jerusalem Warriors
- Islamic Renewal and Reform Organization
- The Pentagon Gang
- Japanese Red Army (JRA)
- Jamiat ul-Mujahideen (JUM)
- Harakat ul Jihad i Islami (HUJI)
- The Allied Democratic Forces (ADF)
- The Lord's Resistance Army (LRA)

UNCLASSIFIED

UNCLASSIFIED//FOUO

## Personal Representative Review of the Record of Proceedings

I acknowledge that on _19_ December 2004 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #556.

√ I have no comments.

___ My comments are attached.



LtCol ████████████ USAF
Name

19 DEC 04
Date

_____
Signature

UNCLASSIFIED//FOUO

## Personal Representative Review of the Record of Proceedings

I acknowledge that on 24 January 2005 I was provided the opportunity to review the Reconsideration of Tribunal Findings record of proceedings for the Combatant Status Review Tribunal involving ISN #556.

 I have no comments.

____ My comments are attached.

LtCol ▮▮▮▮▮▮ USAF
Name

Signa▮▮▮▮

24 JAN 05
Date

ISN #556

UNCLASSIFIED//FOUO

UNCLASSIFIED//~~FOUO~~

## Personal Representative Review of the Record of Proceedings

I acknowledge that on 21 March 2005 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #556.

_____ ✓ I have no comments.

_____ My comments are attached.

███████████████████████████

█████████████████████, Lt Col, USAF

_22 March 2005_
Date

UNCLASSIFIED//~~FOUO~~